IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

GARY R. McDOWELL,

          Plaintiff,

    v.

CHERRY HILL TOWNSHIP, et al.,

          Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 04-1350 (JBS)

**OPINION**

APPEARANCES:

Ellen M. McDowell, Esq.
Elissa Westbrook Smith, Esq.
McDOWELL RIGA, P.C.
46 W. Main Street
Maple Shade, NJ 08052
    Attorneys for Plaintiff

Lisa M. Kmiec, Esq.
Sean M. Kemp, Esq.
Cherry Hill Township
820 Mercer Street
Cherry Hill, NJ 08002
    Attorneys for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court upon a motion by
Defendant Cherry Hill Township for summary judgment against
Plaintiff Gary R. McDowell, and cross-motion by Plaintiff for
summary judgment against Defendant. Plaintiff, the former
Operations Coordinator of Cherry Hill Township's emergency
medical services, alleges that Cherry Hill Township failed to
compensate him for unpaid overtime and unpaid "on-call" time as

required by the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA").  The time period at issue is a two and one-half year period beginning March 19, 2001 and ending November 16, 2003.  Plaintiff also seeks liquidated damages, attorney's fees and costs pursuant to 29 U.S.C. § 216(b).

The main issue to be decided in the cross-motions is whether Plaintiff is the type of employee entitled to protection under the FLSA - which guarantees that certain types of employees are paid one and one-half times their regular hourly rate for any hours worked in excess of 40 hours per week - or whether Plaintiff is exempt from this requirement of the FLSA.  This adjudication, in turn, depends on the determination of whether Plaintiff is properly categorized as an employee employed in either a bona fide "executive" or "administrative" capacity as these types of employees are exempt from the overtime pay provisions of the FLSA.  If the Court finds that Plaintiff is not exempt under the FLSA - and thus the type of employee entitled to compensation for overtime hours worked - the Court must then determine whether the time Plaintiff spent "on-call" is compensable under the FLSA.

For the reasons discussed below, this Court finds that no material facts are in dispute and that Defendant has shown that Plaintiff is exempt under the FLSA and not entitled to payment for overtime as a matter of law.  Accordingly, Defendant's

summary judgment motion will be granted, and Plaintiff's cross-motion for summary judgment will be denied.

## I.   <u>BACKGROUND</u>

Plaintiff, Gary R. McDowell, is a former employee of Cherry Hill Township's (the "Township") emergency medical services squad.  (McDowell Decl., Pl.'s Ex. A, ¶ 1.)  For nearly 30 years, he worked in a variety of capacities within the Township's emergency medical services squad, beginning in 1974 when he was hired as an emergency medical technician ("EMT") by Cherry Hill Emergency Squad, Inc., ("CHEMS") a non-profit entity that operated independently of the Township.  (McDowell Decl. ¶ 3.)  In 1978, Plaintiff was promoted to captain whereby he gained responsibility for all of CHEMS' operations.  (<u>Id</u>.)  Soon after being promoted to captain, CHEMS and the Township's other independently operated emergency medical service squad were incorporated into the Township and made part of the municipal government.  (<u>Id</u>. ¶ 4.)  At that time, Cherry Hill's emergency medical services squad was divided into two divisions.  (<u>Id</u>.)  Plaintiff was appointed as department head of one of the two divisions - under the title Chief of EMS - a position he held from 1978 through 1995.  (<u>Id</u>. ¶ 5-6, 9.)  As Department Head, Plaintiff was responsible for the hiring, firing, and disciplining of employees in his division, purchasing of supplies and all budgeting related to emergency medical services

3

operations among other duties.  (<u>Id</u>. ¶ 7.)  During this time,
Plaintiff was paid on a salary basis and was only rarely
compensated for additional or overtime hours worked.  (<u>Id</u>. ¶ 11.)

In 1996, CHEMS management was reorganized by the Township
and Plaintiff began reporting to William Moffett, Chief of Police
for the Cherry Hill Police Department.  (Memo from Mayor Susan
Bass Levin to EMS Chiefs, 12/24/96, Pl.'s Ex. C.)  According to
Plaintiff, his "discretionary authority began to [] diminish"
between December of 1995 and March of 2001.  (McDowell Decl. ¶
19).  In early 2001, the Division of Emergency Medical Services
underwent additional reorganization when the Township's governing
body adopted an ordinance transferring the Division of Emergency
Medical Services under the umbrella of the Cherry Hill Police
Department.  (<u>Id</u>. ¶ 27.)  As such, the two divisions of Cherry
Hill emergency medical services were consolidated. (<u>Id</u>.) A new
position, titled EMS Director, was created and the person filling
the new position would be in charge of the consolidated unit.
(<u>Id</u>.)  In March of 2001, Cherry Hill Police Lieutenant William
Kushina ("Lt. Kushina") was appointed to serve as the EMS
Director.  (Courier Post article, 3/8/01, Pl.'s Ex. E; Kushina
Dep. Tr. 10/27/04 at 8, Def's Ex. I.)

A.  <u>Plaintiff's Daily Job Duties under the Reorganized
    CHEMS</u>

Immediately following the transfer of CHEMS into the Cherry
Hill Police Department, neither Plaintiff nor Lt. Kushina had a

clear understanding of Plaintiff's job description and day-to-day duties.  (McDowell Decl. ¶ 47-48.)  During this time, Plaintiff worked closely with Lt. Kushina in order to assist him in managing and supervising the EMTs.  (Id. ¶ 46.)  According to Plaintiff, Lt. Kushina "leaned heavily" on Plaintiff to "teach him how to run CHEMS."  (Id. at ¶ 28.)[1]  After a short period of time and some discussion between Lt. Kushina and Plaintiff, Plaintiff and Lt. Kushina settled on Plaintiff's title ("Operations Coordinator"), job description and daily duties. (McDowell Depo. Tr. 10/27/04, at 8, Def.'s Ex. H.) As EMS Operations Coordinator, Plaintiff would be responsible for a wide variety of duties including:

- supervising and supporting a staff of 10 full-time and 35 part-time EMTs, setting all EMT work schedules and responding to gaps in EMT schedule coverage due to employee vacations, leaves and unexpected absences from work;

- monitoring Township emergency medical services rules and regulations and emergency medical services standard operating procedures;

- monitoring CHEMS' compliance with the Public Employee Occupational Safety and Health Administration Programs and Occupational Safety and Health Administration Program's safety regulations;

- monitoring CHEMS' compliance with Department of Labor regulations and compliance by CHEMS with its EMTs' labor contract;

---

[1]  According to Plaintiff, such a heavy reliance on Plaintiff to help operate CHEMS was a result of Lt. Kushina's limited experience in emergency medical services.

5

- monitoring CHEMS' compliance with Department of Health ambulance regulations and ambulance licensing;

- assisting in formulating and administering CHEMS' annual operating budget and five-year capital improvement budget;

- monitoring CHEMS' supplies and inventory including medical supplies and oxygen;

- performing a variety of what Plaintiff has deemed "administrative" functions such as monitoring and auditing patient reports for processing to billing department, collecting and collating EMT patient reports and assisting with record-keeping of patients records, and assisting with the training of EMTs.

(Memorandum titled Duties and Responsibilities from McDowell to Lt. Kushina, 3/5/01, Pl's Ex. G; see also McDowell Decl. ¶ 38, 49-54; Letter from New Jersey Dept. of Health and Senior Services, 8/12/02, Def.'s Ex. D; Letter from McDowell to New Jersey Department of Labor's Unemployment Insurance Office, 12/12/03, Def.'s Ex. A.)  In addition, Plaintiff was charged with assisting Lt. Kushina in "formulat[ing] CHEMS' long-term goals." (Id. ¶ 54.)  Plaintiff considered himself to be "second in command of the [EMS] division," (Letter to New Jersey Department of Labor's Unemployment Insurance Office, 12/12/03, Def.'s Ex. A), and that from 2001 to 2003 he served as "full-time administrator and supervisor of EMS." (Letter from McDowell to Eric Jacobs, 3/11/03, Def.'s Ex. B.)  From March, 2001 through March of 2003, Plaintiff's salary was approximately $50,000 per year. (Plaintiff's Material Statement of Facts ¶ 157.)

B.   <u>Plaintiff's Duties while On-Call</u>

Soon after his appointment as EMS Director, Lt. Kushina implemented a policy requiring Plaintiff to be "on-call" for 24 hours a day, seven days a week for one-half of each month (i.e. from either the 1st to the 15th of each month or the 16th to the end of the month).  (McDowell Decl. ¶ 40-41.)  Lt. Kushina served as the supervisor on-call for the half of the month that Plaintiff was not on-call.  (<u>Id</u>.)  At the beginning of the month, Lt. Kushina and Plaintiff would typically discuss which one of them would be on-call during which part of the month.  (<u>Id</u>. ¶ 47.)  Kushina and Plaintiff would work out on-call coverage based on their respective vacation plans and availability, or trade on-call shifts.  (<u>Id</u>.; <u>see also</u> McDowell Depo. Tr. 10/27/04, Def.'s Ex. G at 172.)

While on-call, Plaintiff was expected to respond to calls from EMTs regarding scheduling issues and equipment failures/ shortages as well as respond to weather-related emergencies and "major disasters."  (<u>Id</u>. ¶ 42, 46) The vast majority of work conducted while "on-call" was addressing scheduling issues if an employee called out sick or failed to appear at work.  (<u>Id</u>. ¶ 46.)  While on-call, Plaintiff could expect to receive a minimum of one call five out of six days, with the weekends bringing a slightly higher call volume (between three and four calls over

7

the weekend).  (Id. ¶ 44, 45.)  Plaintiff rarely had to
physically report to work in response to calls but a typical
issue prompting a call - such as an EMT calling out sick and
Plaintiff being required to find a replacement worker - could
take anywhere from five minutes to two and one-half hours.
(McDowell Decl. ¶ 45; McDowell Depo. Tr. 10/27/04, at 169-70.)
Plaintiff reports that, while on-call, he watched television,
went to restaurants, attended movies and concerts, went shopping,
visited relatives, socialized and attended an air show in
Pennsylvania.  (Id. ¶ 51; see also Ellen McDowell Depo. Tr.
1/11/05, Def.'s Ex. T. at 55; McDowell Depo. Tr. at 167.)
Plaintiff states that, while on-call, he was not "free to take an
evening off with his wife," to take vacation or travel out of
town over the weekend as he was required to "be close enough in
proximity to respond to Cherry Hill in the event of a major
incident or a weather emergency."  (McDowell Decl. at ¶ 48.)

    C.  CHEMS Undergoes Additional Reorganization

    In September of 2003, Lt. Kushina stepped down as EMS
Director amid additional reorganization. (McDowell Decl. ¶ 67.)
In a memo to CHEMS staff, Lt. Kushina stated that Plaintiff would
be the only individual on-call until the transfer of CHEMS to the
Cherry Hill Fire District 13 was complete, leaving him as the
only individual in an administrative role in CHEMS.  (Memo from
Lt. Kushina to CHEMS personnel, 9/10/03, Pl.'s Ex. V.)  On

November 1, 2003, CHEMS was officially transferred to the authority of the Cherry Hill Fire District 13 and all CHEMS employees became employees of the Township.  Plaintiff resigned from his position on November 16, 2003. (McDowell Decl. ¶ 72.)

    D.   <u>Procedural History</u>

    Plaintiff filed the present action with this Court on March 19, 2004.  Plaintiff's Complaint states that this Court has jurisdiction over this matter under 28 U.S.C. §1331.  Defendant Township answered Plaintiff's Complaint on May 10, 2004.  Upon the conclusion of discovery, Defendant filed a motion for summary judgment under Federal Rule of Civil Procedure 56(b) on April 26, 2005.  Plaintiff opposed Defendant's motion and cross-moved for summary judgment on May 6, 2005.  Defendant timely filed opposition to Plaintiff's cross motion on May 20, 2005.  This motion is decided without oral argument pursuant to Rule 78, Fed. R. Civ. P.

## II.  <u>DISCUSSION</u>

    A.   <u>Summary Judgment Standard of Review</u>

    In its motion for summary judgment, Township argues that Plaintiff is not entitled to compensation for overtime he worked because, under the FLSA, he qualifies as either a bona fide "executive" or "administrative" employee and therefore is exempt from the provisions of the FLSA that require that an employer compensate an employee for all hours worked over 40 hours per

week.[2]  Furthermore, Township argues that, even if Plaintiff is

---

[2]  Defendant moves for summary judgment pursuant to Rule 56(b), Fed. R. Civ. P.  A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "[T]he nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.

The moving party always bears the initial burden of showing that no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.

The non-moving party "may not rest upon the mere allegations or denials of" its pleading in order to show the existence of a genuine issue.  Fed. R. Civ. P. 56(e).  Plaintiff must do more than rely only "upon bare assertions, conclusory allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985), cert. denied, 474 U.S. 1010 (1985) (citation omitted); see Liberty Lobby, 477 U.S. at 249-50.  Thus, if the non-moving party's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment.  Liberty Lobby,

not exempt under the FLSA, the time Plaintiff spent "on-call" was not so restrictive as to warrant compensation under the FLSA.

Plaintiff filed a cross-motion for summary judgement,[3] arguing that Township has failed to meet its burden of proof that Plaintiff is exempt under the FLSA.  In addition, Plaintiff argues that Township must compensate him for his time spent on-call, because, while on-call, he was required to remain in a state of readiness that significantly interfered with his personal life.  Finally, Plaintiff asserts that, in refusing to compensate him for overtime and on-call time, Township's violation of the FLSA was willful, entitling him to overtime

_____

477 U.S. at 249-50; Country Floors, 930 F.2d at 1061-62.


[3]  The summary judgment standard does not change when the parties have filed cross-motions for summary judgment.  See Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987). Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is
> entitled to summary judgment, and the making of such
> inherently contradictory claims does not constitute an
> agreement that if one is rejected the other is
> necessarily justified or that the losing party waives
> judicial consideration and determination whether
> genuine issues of material fact exist.

Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001) (citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1988)).

worked between September, 2001 to September, 2002 (benefitting
from a three-year rather than simply a two-year statute of
limitation), liquidated damages, attorney's fees and costs as
proscribed in the FLSA.

      B.   <u>Procedural Issues Related to Local Civil Rule 56.1</u>

Before reaching the merits of Township's motion and
Plaintiff's opposition thereto and cross motion, the Court must
consider a procedural issue raised by Plaintiff.[4]  Plaintiff
states that, because Township failed to provide the Court with a
Statement of Material Facts with citations to the record, this
Court may reasonably deny Township's motion for summary judgment.
Plaintiff is no doubt referring to Local Civil Rule 56.1 ("Rule
56.1"), which provides that "on a motion for summary judgment,
each side shall furnish a statement which sets forth material
facts as to which there exists or does not exist a genuine
issue."  L.Civ.R. 56.1.

Although Township's initial brief does contains a statement
of fact (titled "Factual Background"), Township has not submitted
a separate statement specifically identifying the disputed and
undisputed material facts as required by Rule 56.1.  A moving

----

[4] Although this issue was raised by Plaintiff in a footnote
to its Statement of Material of Facts rather than having been
brought to the Court's attention in its brief in support of its
cross-motion, the Court will address this issue before proceeding
to address the merits of Township's motion or Plaintiff's cross-
motions.

party's failure to comply with Rule 56.1 is itself sufficient to deny its motion.  See Bowers v. NCAA, 9 F. Supp.2d 460, 476 (D.N.J. 1998)("This failure to comply with the Local Civil Rule would by itself suffice to deny [defendant's] motion for summary judgment.") However, some courts in this District have declined to deny such motions on these grounds in instances where there is "no evidence of bad faith on the part of the moving party," Fowler v. Borough of Westville, 97 F. Supp.2d 602, 606-07 (D.N.J. 2000); see Pipko v. CIA, 312 F. Supp.2d 669, 675 (D.N.J. 2004)(excusing CIA's failure to file statement "since the parties do not dispute the procedural or factual background of this action" and there was no evidence of bad faith.)  Instead, the court can choose to "admonish that the parties consult the local rules in future cases."  Comose v. New Jersey Transit Rail Operations, Inc., 2000 U.S. Dist. LEXIS 20790 (D.N.J. 2000); see also Leme v. International Total Serve., 56 F. Supp.2d 472, 477 n.4 (D.N.J. 1999).

Township has failed not only to submit a statement of material fact as required by Local Civil Rule 56.1 but also any affidavits supporting its motion.  Rather, Township relies on documentary evidence and depositions in support of its motion - even after having the opportunity to submit such affidavits and a Statement of Material Facts in its reply after being prompted to do so by Plaintiff's footnote in its cross-motion for summary

judgment.  Despite this, the Court, having found no evidence of
bad faith, and finding Defendant's factual representations to be
well-organized, akin to a Rule 56.1 statement, will not deny
Defendant's motion on these procedural grounds and will now
address the merits of the case.

    C.   <u>The Fair Labor Standards Act and Exemption from
        Overtime for Certain Employees</u>

    The Fair Labor Standards Act establishes certain minimum
labor standards necessary to "aid the unprotected, unorganized,
and lowest paid of the nation's working population...who lack[]
sufficient bargaining power to secure for themselves a minimum
subsistence wage."  29 U.S.C. § 202(a); <u>see</u> <u>Brooklyn Sav. Bank v.
O'Neil</u>, 324 U.S. 697, 707 n. 18 (1945).  To this end, the FLSA
requires employers to pay overtime - at the rate of one and one-
half the employees regular rate of pay - to any employee who
works more than forty hours per week.  <u>See</u> 29 U.S.C. § 207(a)(1).
The FLSA provides an exemption to the overtime pay provisions,
however, for "any employee employed in a bona fide executive,
administrative or professional capacity."  29 U.S.C. § 213(a)(1).

    The FLSA grants the Secretary of Labor (the "Secretary")
broad authority to "define and delimit" the scope of the
exemption for executive and administrative employees. <u>Id</u>. Thus,
this Court is guided in its interpretation and application of the
FLSA by case law and by regulations and interpretations
promulgated by the Secretary. The Secretary's interpretation of

an employee employed in either an "executive" or "administrative"
capacity is set forth in the Code of Federal Regulations.  See
id.; see also 29 C.F.R. § 541.1 and 541.2.  These regulations
must be given "controlling weight unless they are found to be
arbitrary, capricious, or contrary to statute."  Reich v.
Newspapers of New England, Inc. 44 F.3d 1060, 1070 (1st Cir.
1995).  An employer, here the Township, carries the burden of
proof that an employee is exempt under the FLSA and the overtime
provisions of the FLSA are to be narrowly construed against the
employer.  See Arnold v. Ben Kanwosky, Inc., 361 U.S. 388 (1960);
see also Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir.
2004); Klem v. County of Santa Clara, 208 F.3d 1085, 1089 (9th
Cir. 2000).

Township argues that, because Plaintiff was employed in an
"executive" or "administrative" capacity, Plaintiff is therefore
exempt from the overtime payments under the FLSA.[5]  Township
argues that Plaintiff spent nearly all of his work time
performing various managerial and administrative tasks that were
essential for the operations of CHEMS.  These duties were high-
level administrative tasks, requiring that Plaintiff inject his
judgment and use his considerable emergency medical services

---

[5]  The parties agree that Plaintiff does not meet the
exemption for employees employed in a bona fide "professional"
capacity.  Thus, this exemption under Section 213(a)(1) of the
FLSA will not be addressed.

15

managerial experience in operating the Township's emergency
medical services.  In contrast, Plaintiff portrays himself as a
secretary or bookkeeper, performing clerical tasks which required
virtually no independent thought.  For the reasons that follow,
this Court finds that there is no genuine issue of material fact
with respect to Plaintiff's job duties and that, even when
narrowly construed against Township, at minimum, Plaintiff was
employed in an administrative capacity (and likely in an
"executive" capacity) and therefore Plaintiff is exempt under the
protections set out in Section 207(a)(1).

   1.  <u>Administrative Exemption</u>

  The FLSA provides an exemption from the overtime pay
provision for any employee employed in a bona fide administrative
capacity.  <u>See</u> 29 U.S.C. § 213(a)(1).  An employee is deemed
employed in an administrative capacity if he is (1) paid on a
"salary-basis" of at least $250 per week, (2) the employee's
"primary duty" consists of the performance of office work and
non-manual work that is "directly related to management policies
or general business operations" of his employer; and (3) the
employee's performance of his or her primary duties include work

"requiring the exercise of discretion and independent judgment."[6]
29 C.F.R. § 541.2(e)(2)(2003).[7]

a. Whether Plaintiff was Paid on a Salary Basis

The first prong of the administrative exemption test is
whether the employee was compensated at a salary of more than
$250.00 per week.  An employee is considered "paid on a salary
basis" if he or she "regularly receives each pay period on a
weekly, or less frequent basis, a predetermined amount
constituting all or part of his compensation, which amount is not

_____

[6] Section 541.2 sets forth two tests under which an
employee can determine whether an employee falls under the
"administrative" exemption: The "long test," which applies to
employees paid on a salary or fee basis at a rate of not less
that $155 per week; and the "short test," which applies to
employees paid at a rate not less that $250 per week.  See 29
C.F.R. § 541.2(e)(2).  Here, Plaintiff disputes whether
Plaintiff's payment status qualifies as being paid on a "salary
basis."  This Court finds Plaintiff's argument unpersuasive, as
more fully discussed Section II.C.1.a, infra of this opinion.
The Court concludes that Plaintiff was paid on a salary basis of
at least $250 per week.  As such, the Court will examine the
Plaintiff's employment status under the "short" test.

[7] The Department of Labor recently revised the FLSA's
implementing regulations governing certain exemptions, effective
August 23, 2004.  See 29 C.F.R. § 541.  Plaintiff's employment
with CHEMS ended on November 16, 2003 and the Complaint was filed
on March 19, 2004.  Therefore, the Court applies the 2003
regulations and interpretations.  This approach is consistent
with the approach taken by a number of other district courts
addressing the issue of which regulations apply in light of the
Department of Labor's new regulations.  See Jackson v. McKesson
Health Solutions, LLC, 2004 U.S. Dist. LEXIS 21997 (D. Mass.
2004); Belt v. EmCare, Inc., 351 F. Supp.2d 625 (E.D. Tex. 2005);
Bagwell v. Florida Broadband, LLC, 2005 U.S. Dist. LEXIS 16469
(S.D. Fla. 2005).  In addition, the numbering throughout this
opinion references the 2003 regulations' numbering used by the
parties in their briefing.

subject to reduction because of variation in the quality or quantity of the work performed."  29 C.F.R. § 541.118.

In the present case, Plaintiff was paid a salary of approximately $48,000 per year and it is undisputed that Plaintiff was paid, each pay period, a predetermined amount that exceeded $250.00 per week.  (Township Payroll Records, Def.'s Ex. J.) Plaintiff contends, however, that he fails to meet the criteria of the "salary basis" test because his pay was subject to reduction under an employee discipline policy that could (and, in fact, did) result in him being suspended without pay. (McDowell Decl. ¶ 59.)  Such a disciplinary policy subjects an employee to a pay reduction due to a "variation in the quality or quantity of work performed" - which according to §541.118 is inconsistent with an employee being paid on a "salary basis."  29 C.F.R. § 541.118.

In support of his position, Plaintiff cites, among other cases, Auer v. Robbins. 519 U.S. 452, 456 (1997).  Plaintiff highlights the Secretary of Labor's interpretation of § 541.118 that an employer,

> that engages in a practice of making impermissible deductions in its employee's pay, or has a policy that effectively communicates to its employees that such deductions will be made, necessarily has no intention of paying its employees on a "salary basis."

Id.; see also Klem v. County of Santa Clara, 208 F.3d 1085 (9th Cir. 2000).  In Auer, the Supreme Court affirmed a lower court's

18

ruling that the salary-basis test was satisfied as to certain
high-level officers employed by the St. Louis Police Department.
See id at 454-55.  The plaintiffs in Auer argued that the salary-
basis test was not met in their case because, under the terms of
the police department's employee manual, their compensation could
be reduced for a variety of disciplinary infractions.  See id. at
456.  The Supreme Court, while giving deference to the Secretary
of Labor's interpretation of the salary-basis test, concluded
that the officers met the salary-basis test because the police
department's manual did not "effectively communicate" to them
that pay deductions are an anticipated punishment for employees
in the officer's position (since the police department's manual
applied to both salaried employees -- such as the officers -- and
employees who were unquestionably not paid on a salary basis and
that pay reduction disciplinary measures may be referenced only
to the latter).  Id. at 461-62.  Moreover, a one-time deduction
in an officer's pay under unusual circumstances was not
sufficient to create "substantial likelihood" that such
deductions will occur in the future.  Id. at 462.

This Court is not persuaded that the holding in Auer
requires that this Court find that Plaintiff was not paid on a
salary basis.  As with Auer, a disciplinary policy existed with
respect to salary reductions that was applied to all CHEMS
personnel, most of who were unquestionably paid on a non-salary

19

basis.  (Standard Operating Procedures Manual, 9/1/02, Pl.'s Ex.
H.)  Thus, no clear inference exists that the salary-reduction
policy would apply to Plaintiff as opposed to the majority of
CHEMS employees paid on a non-salary basis.  The broadly-worded
disciplinary procedure established in Township's EMS Standard
Operating Procedures Manual did not "effectively communicate" to
Plaintiff, one of only two CHEMS supervisors, that he was subject
to disciplinary salary deductions. The fact that Plaintiff was
subject to a three day suspension without pay on one occasion for
an altercation with a fellow employee no doubt constitutes the
"unusual circumstances" surrounding a temporary salary suspension
and thus would not create a substantial likelihood that such
deductions will take place in the future.

Aside from this Court's analysis under Auer, a finding in
this case that Plaintiff fails the "salary-basis" test would
yield a perverse result for several reasons.  First, the
regulations promulgated by the Department of Labor state that an
improper deduction of an employee's salary does not necessarily
require a finding that an employee was paid on a non-salary
basis.  See 29 C.F.R. § 541.118(a)(6)(emphasis added).  Rather,
the effect of the improper deduction "will depend upon the facts
in the particular case." Id.; see Brock v. The Claridge Hotel and
Casino, 846 F.2d 180 (3d Cir. 1988).  In the present case, where
all relevant factors weigh in favor of finding that Plaintiff was

paid on a salary basis (<u>i.e.</u>, regular payments made to Plaintiff in predetermined amounts independent of whether Plaintiff actually worked), the Court finds that the temporary one-time salary deduction occurring along with Plaintiff's suspension does not result in the finding that Plaintiff was paid on a non-salary basis.

Second, although the regulations as amended in 2004 are not controlling in this matter, they are illustrative of the Secretary's current interpretation of the statutory requirements to the salary-basis test.  Specifically, § 541.602(b)(5) of the 2004 amended regulations creates an exception to the prohibition on salary deductions under the salary-basis test for all deductions from pay of exempt employees made as part of an unpaid disciplinary suspension of one or more full days for the infraction of work-place rules.  <u>See</u> 29 C.F.R. § 541.602(b)(5)(2004)(stating that such policy must be "imposed in good faith" and pursuant to a written policy applicable to all employees.)  Thus, under the Secretary's current regulations, Plaintiff would satisfy the "salary-basis" test.

Based on the foregoing, it is clear to this Court that Defendant has satisfied the requirement that Mr. McDowell was paid on a "salary-basis."

b.  <u>Whether Plaintiff's Primary Duty Consists of
Office or Non-manual Work Directly Related to
General Business Preparation of CHEMS</u>.

The second prong in the "administrative" capacity exemption
involves two separate analyzes.  First, the Court must determine
whether Plaintiff's primary duty consists of office work or non-
manual work.  <u>See</u> <u>id</u>.  If so, the Court must then determine
whether Plaintiff's office work "directly relates to the general
business operations" of CHEMS.  <u>See</u> 29 C.F.R. § 541.2(e)(2).  The
Court will address these issues in order.

(i)  <u>Primary Duty Consists of Office or Non-
Manual Work</u>

Regulations establishing the Secretary of Labor's
interpretation of an employee's primary duty relates to "[t]he
amount of time spent in the performance of the managerial duties"
and that "a good rule of thumb [is] that [the employee's] primary
duty means the major part, or over 50 percent, of the employee's
time."  29 C.F.R. § 541.103.  Thus, an "employee who spends over
50 percent of his time in management would have management as his
primary duty."  <u>Id</u>.

The parties do not dispute that Plaintiff spent nearly all
of his time working on and dealing with administrative and "back-
office" issues rather than going on EMT "calls" and responding to
emergency situations.[8]  Plaintiff stated that he participated in

_____

[8]  Rather, the dispute centers around whether these tasks
and duties constitute "administrative" tasks.

22

responding to emergency calls with EMT crews no more than twenty times per year, (McDowell Depo. Tr. undated, 10/27/04, at 123), whereas a full-time EMT would respond to between twenty and thirty calls per week (Scott Martin Depo. Tr. at 12, Def.'s Ex. N.) Plaintiff supervised the day-to-day operations of CHEMS including performing such tasks as making the employee schedule, dividing up work tasks among EMTs, monitoring inventory and, for at least half of his off-duty time, making himself available in case unexpected shift vacancies needed to be filled with a replacement EMT or equipment issues arose.  Plaintiff also served as the contact person at CHEMS for state and federal agencies such as Public Employee Occupational Safety and Health group and Occupational Safety and Health Administration (serving to monitor compliance with the various health agency-related policies), collected and organized patient reports, and managed the safety, readiness and repair of the ambulances and inventory used by the EMTs. Thus, Defendant has shown that Plaintiff's primary duty was administrative, and not manual, in nature.

> (ii)  <u>Directly Related to the General Business Operations of CHEMS</u>

The Department of Labor's regulations interpret the phrase "directly related to the management policies or general business operations of the employer" as "describ[ing] those types of activities relating to the administrative operations of the business as distinguished from 'production'" and that an employee

satisfies this criteria only if he "performs work of substantial importance to the management or operations of the business of his employer...."  29 C.F.R. § 541.205(a).  The "production" for an operation such as CHEMS is in the rendering of emergency medical services.  It is undisputed that the vast majority of Plaintiff's activities consisted of "back-office" or supervisory activities rather than actually responding to medical emergencies with an ambulance crew (which Plaintiff admits he rarely did).  What is also undisputed is that the administrative functions performed by Plaintiff were vital to the operations of CHEMS.  Plaintiff himself points out that, upon first assuming his position as EMS Director, Lt. Kushina "leaned heavily" on Plaintiff to teach him how to operate CHEMS.  (McDowell Decl. ¶ 28.)  Further, without Plaintiff's work and efforts in devising a work schedule, CHEMS, at best, would run afoul of Township staffing policies or, at worst, would be under-staffed and unable to adequately respond to certain medical emergencies due to lack of coverage.  Finally, the other administrative tasks performed by Plaintiff - monitoring inventory, monitoring health regulation compliance, collecting and collating patient records, etc. -- were all essential to the uninterrupted operations of CHEMS.

Having found (1) that Plaintiff's primary duty consisted of office work related to the management of CHEMS EMT staff and equipment, and (2) that these activities were directly related to

24

the general business operations of CHEMS and were of substantial
importance to CHEMS, the Court concludes that Plaintiff's
position satisfies the second prong of the short test.

        c.  <u>Whether Plaintiff's Duties included Work
           Requiring the Exercise of Discretion and
           Independent Judgment</u>.

     The third prong of the "administrative" capacity analysis is
whether an employee uses "discretion and independent judgment" in
carrying out his job duties.  <u>See</u> 29 C.F.R. § 207(a).  The
Secretary's interpretation defines "the exercise of discretion
and independent judgment" as the "comparison and the evaluation
of possible courses of conduct and acting or making a decision
after the various possibilities have been considered."  <u>Id</u>.  Such
an employee must also have the "authority or power to make an
independent choice, free from immediate direction or supervision
and with respect to matters of significance."  <u>Id</u>.; <u>see also</u> <u>Wage
& Hr. Div., U.S. DOL.</u>, <u>Op. Ltr.</u>, 1997 WL 97188 (September 12,
1997)("it is not sufficient that an employee make limited
decisions, within clearly 'proscribed parameters,'...[but] there
must be true discretion and independent judgment on matters of
significance and consequence.")

     Plaintiff paints his job duties as mechanically entering in
requested hours in order to create a shift schedule.  (Pl.'s Br.
at 7.)  Morever, Plaintiff argues that, because every task
Plaintiff performed required the approval of his superior, his

job did not require him to exercise discretion and independent
judgment.  (Pl.'s Br. at 7-8.)   The Court disagrees.  First,
Plaintiff's recommendations and actions directly impacted CHEMS'
operations and financial future.  Plaintiff's portrayal of
himself as an employee performing secretarial and clerical tasks
is inconsistent with the job duties and responsibilities stated
in his own declaration.  Rather, the image this Court obtains
from Plaintiff's declaration, and evidence presented by Township,
is that Plaintiff was a supervisor who had significant
responsibility and who operated largely independently (except for
certain instances where approval was needed from his superior).
For example, Plaintiff states that, while on-call, he was the
only person at CHEMS available to address scheduling and staffing
issues and equipment failures that may arise between the hours of
5 p.m. and 8 a.m.  (McDowell Decl. ¶ 44.)  In addressing these
issues in a manner to ensure proper EMT coverage without running
aground of Township policies, Plaintiff necessarily had to
exercise discretion and independent judgment - determining how to
best and most efficiently resolve staffing issues.  Indeed, as
there is no evidence in the record that Plaintiff called Lt.
Kushina in order to get approval for staffing decisions made
while on-call, the Court must conclude that Plaintiff had the
authority to make independent choices, free from immediate
supervision.  Moreover, Plaintiff describes one of his duties

while on-call as being available to respond to "major incidents."
(McDowell Decl. ¶ 46.)   As the sole on-call emergency medical
services supervisor for one-half of each month charged with
responding to major incidents, it is inconceivable that the
Township would leave such a heavy responsibility in the hands of
someone who rarely exercised discretion and independent judgement
or who had no authority to make decisions on matters of
significance.

In addition, Plaintiff's portrayal as someone who performed
purely ministerial work is inconsistent with Plaintiff's own
description of his job in letters to the New Jersey Department of
Labor and the Township's chief of staff (in which he states that
he is "second in command" of CHEMS and served as a "full-time
supervisor" of EMS services, respectively).   Certainly, an
employee serving as "full-time supervisor" of an operation of 45
full and part-time employees existing to provide emergency
medical services to a large township would be required to
regularly exercise discretion and independent judgement with
respect to matters of significance.

The thrust of Plaintiff's argument that he does not qualify
as an employee who exercises discretion and independent judgment
is that Plaintiff lacked the ultimate authority to make certain
decisions for CHEMS (such as hiring, firing and disciplining
employees and purchasing equipment).   Plaintiff cites the case of

27

Vela v. City of Houston for support for this argument.  276 F.3d
659 (5th Cir. 2001).  In Vela, the Fifth Circuit, in reversing a
lower court's decision, held that captains and managers of
Houston's EMS squad seeking overtime pay were not exempt as
either administrative or executive employees. See id. at 677. The
Vela court's holding, however, was based on the fact that the
employer had presented no evidence demonstrating that the EMS
captains and managers had any administrative duties. See id.("The
City presents no affidavits, testimony, or other evidence
concerning the actual management duties performed by employees in
these three classifications or the time spent on such management
duties.  A generic job description tells us nothing about the
specific duties of each Manager or what percentage of time was
spent on management activities.") In contrast to Vela, this Court
has ample undisputed evidence of Plaintiff's job duties and of
the many decision-making tasks he actually performed.

        Furthermore, Plaintiff's lack of ultimate departmental
decision-making authority does not necessarily defeat a finding
that he regularly exercised independent judgement and discretion
in the performance of his job duties.  See Bagwell v. Florida
Broadband, LLC, 2005 U.S. Dist. LEXIS 16469 (S.D. Fla. 2005)
citing Dymond v. United States Postal Serv., 670 F.2d 93 (8th
Cir. 1982)(the district court held that a computer network
operations engineer exercised independent judgment and discretion

28

in *suggesting* hiring, pay raises and new equipment for a technology company despite the fact that the CEO and director of engineering had ultimate decision-making authority in these matters).  Like the computer network operations engineer in Bagwell, Plaintiff had discretion to suggest disciplinary actions and equipment purchases and to participate in hiring of new personnel even though he might not have the ultimate say in these matters.[9]

Based upon the foregoing, the Court concludes that Plaintiff exercised discretion and independent judgment, and so meets the third prong of the "short test."  Having found that the requirements of the administrative exemption are met, the Court finds that Plaintiff is exempt from the overtime provisions of the FLSA.

### 2.   Executive Exemption

Even if Plaintiff had not been exempt from the overtime provisions of the FLSA as an employee employed in an

---

[9]  The Court recognizes that Plaintiff does not have a job title ("Operation Coordinator") that, according to the Department of Labor's regulations, is typical of an employee that qualifies as an employee employed in an administrative capacity.  See 29 C.F.R. § 541.201(a)(1)("Typical titles of persons in this group are executive assistant to the president, confidential assistant, executive secretary, assistant to the general manager, [and] administrative assistant.").  However, Plaintiff's job description as set forth in his own declaration fits the description of such an employee established in the regulations, that is a person who "assist[s] an executive in the performance of his duties without themselves having executive authority." Id. At minimum, Plaintiff's duties fit this description.

administrative capacity, Plaintiff would be exempt from the overtime provisions as an employee employed in a bona fide executive capacity.  <u>See</u> 29 U.S.C. § 213(a)(1).  The executive exemption applies to employees who; (1) are paid on "a salary basis" of at least $250 per week; (2) have as their primary duty, the "management of the enterprise in which the employee is employed;" and (3) customarily and regularly direct the work of two or more other employees.[10]  29 C.F.R. § 541.1(f)(2003).

      a.  <u>Whether Plaintiff's "Primary Duty" Consisted of the Management of CHEMS</u>.

An employee is employed in an executive capacity if his "primary duty" consisted of "management" of the operation for which he is employed.  <u>See</u> 29 C.F.R. § 541.1.  The determination of an employee's primary duty is a fact sensitive inquiry, but "a good rule of thumb [is] that [an employee's] primary duty means the major part, or over 50 percent of the employee's time" on

_____

[10]  Similar to the discussion <u>supra</u> regarding Section 541.2, Section 541.1 sets also forth two tests under which an employee can determine whether an employee falls under the "executive" exemption: The "long test," which applies to employees paid on a salary or fee basis at a rate of not less that $155 per week; and the "short test," which applies to employees paid at a rate not less that $250 per week.  <u>See</u> 29 C.F.R. § 541.1(f).  Here, Plaintiff disputes whether Plaintiff's payment status qualifies as being paid on a "salary basis."  This Court finds Plaintiff's argument unpersuasive, as more fully discussed Section II.C.1.a, <u>supra</u> of this opinion.  The Court concludes that Plaintiff was paid on a salary basis of at least $250 per week.  As such, the Court will examine the Plaintiff's employment status under the "short" test.  Because of this and the fact that this Court concluded that Plaintiff was paid on a salary bases, <u>supra</u>, we need not discuss it again here.

managerial tasks.  29 C.F.R. § 541.103.[11]  "Management" duties

include such activities as:

- selecting and training employees;

- directing and planning the work of employees and apportioning the work among them;

- appraising the work of employees for purposes of bonuses and commendations;

- handling grievances, complaints and employee discipline;

- providing for the safety of employees;

- determining the techniques and type of equipment to be used; and

- controlling the "flow and distribution" of material and merchandise to be bought and stocked (particularly supplies that provide for safety of the employees and the employer's property).

See 29 C.F.R. § 541.102.

Township argues, and this Court agrees, that there is ample

undisputed evidence on the record for the Court to conclude that

Plaintiff's "primary duty" was management.  Most notably,

Defendants submitted a letter Plaintiff wrote to the New Jersey

Department of Labor in which he stated that he served as the

---

[11] Time spent on managerial duties alone, however, is not the sole test of an employee's primary duty if the employee does not spend over 50% of his time in managerial duties.  See 29 C.F.R. § 541.103.  Other "pertinent factors" to consider are (1) the relative importance of managerial duties; (2) the frequency with which the employee exercises discretion; (3) his relative freedom from supervision and (4) the relationship between his salary and the wages paid other employees.  See 29 C.F.R. § 541.103.

"second in command" and a letter to Township's chief-of-staff
that he was the "full-time...supervisor" at CHEMS.  (Letter to
N.J. Dept. of Labor, 12/12/03, Def.'s Ex. A; Letter to N.J. Dept.
of Health, 8/12/02, Def's Ex. D.)  Plaintiff also spent a large
portion of his time directing and planning the work of employees
as he regularly set the work schedule for all full-time and part-
time EMTs, handling scheduling matters such as sick leave,
vacations and unexpected absenteeism, and administering payroll
for all employees. (McDowell Decl. ¶ 29.)  Plaintiff also
regularly assigned job duties and chores to subordinate
employees.  (Scott Martin Dep. Tr. at 8.)  While plaintiff did
not have the ultimate authority to approve purchase orders,
Plaintiff was charged with monitoring inventory, including
medical supplies and oxygen. (McDowell Decl. ¶ 29.)  Plaintiff
also played a part in providing for the safety of the EMTs -
serving as CHEMS' contact person with the Public Employees
Occupational Safety and Health program and the Occupational
Safety and Health Administration.  (Letter from POSH, Def.'s Ex.
D.)  Finally, while not having the ultimate authority to
interview and select employees, Plaintiff did play a part in the
hiring process for both full and part-time personnel.[12]

---

[12]  In a factually similar case interpreting whether an
employee's primary duty consisted of management, the District of
Maryland held that a Baltimore County Fire Department captain's
"primary duty" was management when he spent almost all of his
time directing employees in the field, performing administrative

32

Such acts do not strike the Court as merely "clerical" tasks
as argued by Plaintiff.  Rather, they required that Plaintiff
exercise independent judgment and resourcefulness to ensure that
the EMS was fully staffed while still complying with the
Department of Labor regulations and the Township's policies
regarding overtime work.  Accordingly, the first prong of the
executive exemption test is met.

      b.  <u>Whether Plaintiff's Work Includes the Customary
and Regular Direction of the Work of Two or More
Employees</u>

In addition to the requirement that an employee's primary
duty consists of the management of his employer's operation, the
employee's duties must include the "customary and regular
direction of the work of two or more employees."  <u>See</u> 29 C.F.R. §
541.1.  This requirement is straight forward - the test is met if
the employee supervises the work of two or more employees on a
"customary" and "regular" basis (meaning a frequency that is
greater than occasional).  <u>See</u> 29 C.F.R. § 541.105; 29 C.F.R. §
541.108.  An employee, however, need not be the ultimate

_____

tasks in regard to management, handling sick leave, managing the
distribution of equipment and briefing subordinates regarding
special orders.  <u>See</u> <u>Quirk v. Baltimore County</u>, 895 F. Supp. 773,
787-88 (D. Md. 1995).  The court also held that, the fact that
the captain could not (a) discipline employees (but only
recommend disciplinary action to their superior),(b)hire and fire
employees or (c) recommend bonuses and commendations did not
remove the captain from eligibility based on the exemption.  <u>See</u>
<u>id</u>. Rather, directing personnel and equipment was the "paramount"
question regarding whether the captain's duties qualified as
subject to the exemption.  <u>See</u> <u>id</u>.

authority on all decisions in order to qualify as an executive for purposes of an exemption under the FLSA.  See 29 C.F.R. 541.105(d).

Based on the undisputed facts, this Court finds that Plaintiff satisfies the second prong of the executive analysis. From 2001 to 2003, CHEMS had approximately 45 full and part-time employees.  Deposition testimony of CHEMS EMTs presented by the Township demonstrates that Kushina and the other EMTs considered Plaintiff the supervisor of the EMS (although, for some decisions, Plaintiff did not have ultimate authority).  Indeed, Plaintiff considered himself the "supervisor for EMS."  As contemplated in § 541.105(d) of the Code of Federal Regulations, Plaintiff can correctly be deemed to customarily and regularly direct the work of two or more employees even though the ultimate authority with respect to certain decisions was left to Lt. Kushina.  29 C.F.R. § 541.105(d).

Having found that the requirements of the executive exemption are met, the Court finds that Plaintiff is exempt from the overtime provisions of the FLSA.

### III.  CONCLUSION

For the reasons discussed above, Township's motion for summary judgment is granted and Plaintiff's cross-motion for summary judgment is dismissed. Based on the Court's conclusions in Parts II.C.1 and 2, supra, the Court need not address

34

Plaintiff's argument that his "on-call" time is mandatorily compensable or Plaintiff's claims for attorneys fees and costs. The accompanying Order is entered.


**November 21, 2005**                 **s/ Jerome B. Simandle**
DATE                                  JEROME B. SIMANDLE
                                      United States District Judge

35